UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PATRICIA NORENBERG,

                    Plaintiff,

  v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                    Defendant.

Case No. 3:09-cv-05583-KLS

ORDER REVERSING DEFENDANT'S
DECISION TO DENY BENEFITS AND
REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS

      Plaintiff has brought this matter for judicial review of defendant's denial of her application for supplemental security income ("SSI") benefits. The parties have consented to have this matter heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Rule MJR 13. After reviewing the parties' briefs and the remaining record, the undersigned hereby finds that for the reasons set forth below, the decision to deny benefits should be reversed and this matter should be remanded to defendant for further administrative proceedings in accordance with the findings contained herein.

FACTUAL AND PROCEDURAL HISTORY

      Plaintiff currently is 46 years old. Tr. 44. She has "some" college education and no clear past relevant work. Tr. 24, 109, 161, 169. On April 18, 2005, plaintiff filed an application for SSI benefits, in which she alleged disability as of September 1, 2003, due to posttraumatic stress

ORDER - 1

disorder, depression, anxiety, panic attacks, osteoarthritis, carpal tunnel syndrome, high blood pressure, cataracts in both of her eyes, and degenerative bone and joint disease. See Tr. 85, 108. A letter dated June 26, 2006, from the Social Security Administration ("SSA") and addressed to plaintiff contained in the record, states that because plaintiff did not keep an appointment set up for the same date with respect to her SSI benefits application, "an informal decision" was made that she was not eligible for such benefits. Tr. 47.

On September 27, 2006, plaintiff filed an application for disability insurance benefits, alleging disability as of January 1, 1999. See Tr. 88.  A "Notice of Disapproved Claim" dated October 2, 2006, addressed to plaintiff reads in relevant part as follows:

> We are writing to tell you that you do not qualify for disability benefits.
>
> **Why We cannot Pay You**
>
> You do not qualify for benefits because this application concerns the same issues which were decided when an earlier claim was denied.  We do not have any information which would cause us to change our earlier decision.
>
> The information you gave us does not show that there was any change in your health before June 2003.  This was when you last met the earnings requirement for receiving benefits.

Tr. 49 (emphasis in original).  In a "Notice of Disapproved Claim" form dated December 26, 2006, the SSA explained its initial decision to deny eligibility regarding plaintiff's SSI benefits application. Tr. 53.  Plaintiff submitted a written request for reconsideration dated January 24, 2007, asking that her "2005 application" be re-opened. Tr. 46.  However, in a "NOTICE OF RECONSIDERATION" dated March 5, 2007, the SSA set forth its reasons why the previous decision regarding her SSI claim was "proper under the law." Tr. 60.

A hearing regarding plaintiff's SSI benefits application was held before an administrative law judge ("ALJ") on April 15, 2009, at which plaintiff, represented by counsel, appeared and

ORDER - 2

testified. See Tr. 28-43. On April 29, 2009, the ALJ issued a decision, determining plaintiff to be not disabled and therefore not entitled to SSI benefits, finding specifically in relevant part that:

>  (1)  at step one of the sequential disability evaluation process,[1] plaintiff had not engaged in substantial gainful activity since the date of her application;
>
>  (2)  at step two, plaintiff had "severe" impairments consisting of degenerative joint disease in her knees and shoulders, an anxiety disorder and depression;
>
>  (3)  at step three, none of plaintiff's impairments met or medically equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings");
>
>  (4)  after step three but before step four, plaintiff had the residual functional capacity to perform light exertional work, but with certain additional non-exertional limitations[2];
>
>  (5)  at step four, plaintiff was unable to perform any past relevant work; and
>
>  (6)  at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 15-27. The Appeals Council denied plaintiff's request for review of the ALJ's decision on September 4 2009, making that decision defendant's final decision. Tr. 1; 20 C.F.R. § 416.1481.

On September 17, 2009, plaintiff filed a complaint in this Court seeking judicial review of defendant's decision. (ECF #1-#3). The administrative record was filed with the Court on December 1, 2009. (ECF #11). Plaintiff argues defendant's decision should be reversed and remanded to the Commissioner for further administrative proceedings for the following reasons:

>  (a)  the ALJ failed to consider the appropriate application date and disability benefits program applied for;

---

[1] The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

[2] "Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b). "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).

ORDER - 3

(b) the ALJ erred in not finding her vision impairment, sleep apea, obesity, bladder incontinence, leg edema, and personality disorder to be severe;

(c) the ALJ erred in assessing plaintiff's residual functional capacity; and

(d) the ALJ erred in finding plaintiff to be capable of performing other work existing in significant numbers in the national economy.

For the reasons set forth below, the undersigned agrees the ALJ erred in determining plaintiff to be not disabled, and therefore finds defendant's decision to deny benefits should be reversed and this matter should be remanded for further administrative proceedings.

## DISCUSSION

This Court must uphold defendant's determination that plaintiff is not disabled if the proper legal standards were applied and there is substantial evidence in the record as a whole to support the decision. See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. See Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold defendant's decision. See Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I. The Appropriate Application and Application Date

Plaintiff argues the ALJ erred in addressing in his decision only her application for SSI benefits, and not her disability insurance benefits claim, and therefore did not consider the entire period of alleged disability at issue in this case. Defendant argues that because plaintiff did not appeal the administrative denial of her application for disability insurance benefits – which was

ORDER - 4

done, as indicated above, on *res judicata* grounds[3] – there has been no final decision concerning that claim, and, accordingly, it is not subject to judicial review.  Plaintiff counters that because that denial did not address "the substantive issues of disability" (ECF #21, p. 2), and the record contains no other administrative decision that did so in regard to the period prior to her date last insured,[4] it cannot be assumed that there has been a denial after an actual hearing in this matter, thereby invoking the preclusive effect of administrative *res judicata*.

Plaintiff, however, misses the point here.  The Social Security Act "clearly limits judicial review" to a "final decision" of the Commissioner "made after a hearing." Califano v. Sanders, 430 U.S. 99, 108 (1977); see also 42 U.S.C. § 405(g).  The meaning of the term "final decision" in Section 406(g) is left to defendant "to flesh out by regulation." Weinberger v. Salfi, 422 U.S. 749, 766 (1975); Mathews v. Eldridge, 424 U.S. 319, 330 (1976) (under Section 405(g) power to determine when finality has occurred ordinarily rests with Commissioner).  According to those regulations, a claimant has a "right to judicial review" only after the claimant has taken all the "necessary administrative steps" to complete the "administrative review process." 20 C.F.R. § 404.900(a).  These steps consist of the initial determination regarding entitlement to benefits,

---

[3] Administrative *res judicata* may be applied by defendant "to bar reconsideration of a period with respect to which she has already made a determination, by declining to reopen the prior application." Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1996); see  also Malave v. Sullivan, 777 F.Supp. 247, 251 (S.D.N.Y. 1991) (acknowledging binding nature of prior final administrative adjudication of same claim based on same facts as current claim).  Although the doctrine of *res judicata* "should not be rigidly applied in administrative proceedings," and should not be "applied so as to 'contravene an overriding public policy or result in manifest injustice,'" it is only "[w]here the record is patently inadequate to support the findings [defendant] made," that its application will be "tantamount to a denial of due process." Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1996); Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988) (res judicata applied less rigidly to administrative proceedings than to judicial proceedings); Krumpelman v. Heckler, 767 F.2d 586, 588 (9th Cir. 1985) (quoting Thompson v. Schweiker, 665 F.2d 936, 940-41 (9th Cir. 1982)).

[4] To be entitled to disability insurance benefits, plaintiff "must establish that [his] disability existed on or before" the date his insured status expired. [4] Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see also Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security statutory scheme requires disability to be continuously disabling from time of onset during insured status to time of application for benefits, if individual applies for benefits for current disability after expiration of insured status).  In this case, plaintiff's date last insured was in June 2003. Tr. 49.

ORDER - 5

reconsideration of that initial determination, a hearing before an ALJ, and review by the Appeals Council of the ALJ's decision. Id.

As noted above, the September 27, 2006 application for disability insurance benefits was denied via a "Notice of Disapproved Claim" on October 2, 2006. The record fails to indicate any further action in regard to that denial – such as seeking reconsideration of it, requesting a hearing before an ALJ or seeking review by the Appeals Council – was taken by plaintiff. Thus, it seems clear plaintiff did not take all the "necessary administrative steps" to complete the administrative review process with respect to her disability insurance benefits application. Further, defendant's refusal to re-open a decision concerning an earlier period in general is "not subject to judicial review." Lester, 81 F.3d at 827. This is because once an administrative decision becomes final, the decision to reopen a disability claim is "purely discretionary." Taylor v. Heckler, 765 F.2d 872, 877 (9th Cir. 1985). Indeed, since a discretionary decision is not a "final decision" within the meaning of 42 U.S.C. § 405(g), defendant's refusal to reopen that decision is, by definition, not a 'final' decision subject to judicial review." Id. (citations omitted).

Accordingly, the ALJ did not err in holding a hearing on and then issuing a decision only in regard to the April 18, 2005 SSI benefits application, as plaintiff did not take all the necessary steps to complete administrative review of her disability insurance benefits application. For the same reason, plaintiff's application for disability insurance benefits is not a final decision made after a hearing and, as such, subject to judicial review. Nor can it be said that the ALJ committed reversible error in using the wrong filing date in referring to plaintiff's SSI benefits application in his decision. See Tr. 15 (ALJ stating application for SSI benefits was filed on September 27, 2006, rather than April 15, 2005), Tr. 27. This is because, as pointed out by defendant, the ALJ discussed – albeit incompletely as explained below – the evidence in the record for the period

ORDER - 6

covered by plaintiff's application for SSI benefits. See 42 U.S.C. § 1382(c)(7) (application for SSI benefits of claimant found eligible therefor is effective on later of first day of month after date application is filed or first day of month following date claimant becomes eligible for SSI benefits).  Accordingly, the ALJ's error here was harmless. See  Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion).

II.     The ALJ's Step Two Findings

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." 20 C.F.R. § 416.920.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." SSR 85-28, 1985 WL 56856 *3; see also Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff has the burden of proving that her "impairments or their symptoms affect her ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).  The step two inquiry described above, however, is only a *de minimis* screening device used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

As noted above, the ALJ found plaintiff had severe impairments consisting of degenerative joint disease in her knees and shoulders, an anxiety disorder and depression.  Also

ORDER - 7

as noted above, plaintiff argues the ALJ erred in not finding her vision impairment, sleep apea, obesity, bladder incontinence, leg edema, and personality disorder to be severe impairments as well.  Except with respect to plaintiff's personality disorder, the Court finds, as explained below, that the ALJ's step two findings were without reversible error.

A.   Vision Impairment

In his decision, the ALJ noted plaintiff had alleged "vision problems" and had a "history of lens implant," finding further in relevant part that:

> . . . In April of 2006 she had an eye irritation but this was felt to be a contact allergy and her prescription was to use warm compresses (Exhibit 6F, p. 10). On June 1, 2006, the claimant complained of a purulent drainage from her eyes.  She said that once the discharge was cleared away she could see just fine and her eyes had not been hurting (Exhibit 6F, p. 12).  The claimant testified that she cannot see close up, but she also testified that she crocheted, and did bead work, activities that require good close up vision.  There are no regular treatment records from an eye doctor in the record.  I find that the claimant does not have significant visual limitations.

Tr. 19-20.  Plaintiff argues there are in fact treatment notes from an eye doctor in the record in which "cataracts in both eyes that caused significant and severe problems" were found. (ECF #13, p. 15 (citing Tr. 279-84).  She further argues that while her cataract surgery was successful, the cataracts did have a significant impact on her ability to see prior to their removal, which she asserts meets the *de minimis* screening test here for at least a portion of the period at issue in this case, given that she has alleged she became disabled in 1999.

First, however, again it must be pointed out that because plaintiff's disability benefits claim is not at issue here, the relevant time period began much later., i.e., subsequent to April of 2005.  Second, the treatment records plaintiff points to fail to indicate any specific work-related limitations stemming from her vision problems at the time, even though her vision may not have been found to be normal.  Third, the substantial evidence in the record supports the findings of

ORDER - 8

the ALJ that once her eye condition cleared up, she essentially had little in the way of significant problems with her vision. See Tr. 370, 372 ("Her vision is sometimes blurry when there is a lot of drainage to be cleared away, but one it is cleared away she can see just fine. Her eyes have not really been hurting."); 418 (no visual limitations); 627-28 (denied problems with eyes and no problems therewith noted on examination). Thus, while the record documents the existence of eye examinations, the Court finds the ALJ's error in stating otherwise harmless. See Stout, 454 F.3d at 1055 (9th Cir. 2006) (error irrelevant to ultimate disability conclusion).

### B.     Sleep Apnea and Obesity

The ALJ acknowledged plaintiff had sleep apnea, but fount in relevant part as follows:

> . . . On January 23, 2008 the claimant reported that she tolerated the CPAP quite well and used it every night. She reported that she slept through the night and awoke feeling rested with more energy. She was noted to be markedly obese, weighing 253 pounds (Exhibit 27F, p.2). The claimant testified that she has lost additional weight and now weighs 236 pounds. Obesity often impacts sleep apnea and this may be improving with the weight loss. The claimant testified that CPAP helped her sleep and that interruptions in sleep were due to her anxiety disorder. I find that the claimant's obesity and her sleep apnea do not cause more than minimal limitations in her ability to perform work related activity.

Tr. 20. Plaintiff challenges the ALJ's findings here on the basis that the ALJ is not a physician, and therefore he had no basis for stating her sleep problems were due to her anxiety rather than to her sleep apnea. But plaintiff herself testified at the hearing, as the ALJ pointed out, that her CPAP machine was working and that on a typical night she would "relax and go to sleep," but then would wake up because of nightmares. Tr. 37-38. As such, the ALJ was not off the mark in stating her "interruptions in sleep" were due to her anxiety.

Plaintiff further challenges the ALJ's statement that the CPAP "helped her sleep," noting she reported in October 2007, that it was not as effective as she had hoped. See Tr. 534. But that report occurred soon after she was first suspected of having sleep apnea (see Tr. 493), and the

ORDER - 9

record contains far more reports of the CPAP being helpful than not, including for the period subsequent to that noted by plaintiff (see Tr. 524 (reporting CPAP machine was working out very well), 530 (reporting CPAP machine helped improve her sleep considerably) 578 (severe sleep fragmentation noted to be responsive to CPAP treatment), 580 (noted to respond well to CPAP)).  Indeed, in late January 2008, plaintiff reported as follows:

> . . . She tolerates the CPAP quite well and uses it every night.  She sleeps through the night and awakens feeling rested.  She has much more energy during the day.  She is generally quite pleased with how things are going.

Tr. 486.  The impression given by the treating medical source also reads as follows:

> Moderate obstructive sleep apnea, though with severe associated hypoxemia and significant sleep fragmentation with a good response to CPAP in the lab.  She has good CPAP tolerance and compliance and an excellent clinical result.  She is not really having any issues that she feels are a problem with her CPAP.  We will go ahead and convert her to permanent use.

Tr. 487.  Accordingly, here too the ALJ did not err in finding this impairment to be non-severe.

In regard to her obesity, plaintiff argues that although she had successfully lost a lot of weight, she continued to weigh a significant amount, which equates to a high Body Mass Index ("BMI"), and which still represents a high degree of risk defendant himself has recognized may impact a claimant's ability to function. See SSR 02-01p, 2000 WL 628049.  But that ruling merely states that obesity may cause significant limitations either alone or in combination with other physical or mental impairments.  Instead, the ruling goes on to state that "[a]s with any other medical condition," obesity will be found to be severe if it in fact "significantly limits an individual's physical or mental ability to do basic work activities." Id. at *4 (noting further that there is no specific level of weight or BMI that equates with severity).  Although plaintiff clearly has been diagnosed with obesity, she fails to point to anything reliable in the record to establish it has actually resulted in specific work-related limitations.

ORDER - 10

C.    <u>Bladder Incontinence</u>

The ALJ found that while plaintiff had "alleged bladder control problems" at the hearing, those problems were "not mentioned frequently in the record," finding further that:

> . . . On June 14, 2006, the claimant reported passing out urine on increasing abdominal pressure such as when she laughs, sneezes or coughs. She was noted to have a urinary infection and was started on antibiotics (exhibit 6F, p.14). At the hearing she said that she had bladder incontinence. Other than the one treatment note, it does not appear that the claimant has sought treatment for this. Bladder incontinence is something that often responds to medication treatment, but the claimant has never felt that her condition was bad enough that she felt the need to see a doctor. I find that the claimant does not have a severe bladder control impairment.

Tr. 20. To counter the ALJ's findings here, plaintiff argues the ALJ had no idea how she in fact felt regarding her bladder problem, that the ALJ could have but did not ask her further as to why she did not get more treatment for it, that she quite likely was embarrassed about it, and that the ALJ does not have adequate knowledge to find it often responds to treatment. While the Court agrees the ALJ failed to point to any actual support in the record for this last statement and thus erred in that respect, the fact remains that plaintiff has pointed to no evidence to establish her bladder problem has resulted in any real work-related limitations, irrespective of how she herself might have felt about her incontinence issues. Accordingly, here too any error committed by the ALJ again was harmless.

D.    <u>Leg Edema</u>

With respect to plaintiff's leg edema, the ALJ found as follows:

> In 2008 the claimant had some problems with lower extremity edema. She underwent numerous lab tests that showed she had elevated liver function tests, which was felt to be due to a fatty liver. The claimant was working on losing weight and her doctors did not advise her of any limitations that she should observe because of her edema. Indeed, they advised her that it was better for her to not sit with her legs dangling but that walking was better (Exhibit 35F, p.69).

ORDER - 11

Tr. 20.  Plaintiff argues the need to elevate her legs while sitting and to get up and move around to keep her legs from swelling will have some erosive effect on her ability to work.  As pointed out by defendant, however, the actual medical recommendation was that she "limit sitting with her legs dangling as much as possible." Tr. 747.  "[B]etter" still, it was noted, would be for her legs to be "elevated or walking." Id. (emphasis added).  Plaintiff further was advised to increase "her activity level." Id.  As such, she was not limited to sitting with her legs elevated as implied by plaintiff, but that if she did sit, she should do so without dangling her legs, which also could involve elevating them.  But the alternative was walking as well, which it should be noted is not as nearly limiting in terms of ability to work than merely sitting.  The Court thus finds the ALJ did not err in determining that the above sitting limitation would not have more than a minimal impact on plaintiff's ability to perform work-related activities.

### E.     Personality Disorder

Plaintiff argues that although she was diagnosed on more than one occasion as having a personality disorder, along with moderate to marked mental functional limitations found to stem at least in part thereto, the ALJ did not mention this fact in his decision, let alone explain why he did not adopt that diagnosis and associated limitations.  Defendant argues the ALJ did state with respect to one of the psychologists who produced those findings, Daniel M. Neims, Ph.D., that "[t]he predicate for his conclusions" were "unexplained". Tr. 18, see also Tr. 19, 24.  Defendant goes on to argue that any error the ALJ made in not adequately addressing plaintiff's personality disorder at step two was harmless, because he went on to appropriately address any limitations stemming therefrom in assessing her residual functional capacity.

The written reports completed by Dr. Neims, however, contain detailed notes regarding his evaluation of plaintiff – upon which he presumably based his diagnoses and the limitations

ORDER - 12

with which he assessed plaintiff – including mental status examinations. See Tr. 392-400, 474-81; see also Clester v. Apfel, 70 F.Supp.2d 985, 990 (S.D. Iowa 1999) (results of mental status examination provide basis for diagnostic impression of psychiatric disorder, just as results of physical examination provide basis for diagnosis of physical illness or injury). The ALJ did not explain why those notes constituted an inadequate explanation. Thus, the ALJ erred in discounting the findings of Dr. Neims on this basis.

The ALJ also erred in not addressing the early March 2006 evaluation report of Dr. Brett Trowbridge, Ph.D., who, like Dr. Neims, diagnosed plaintiff with a personality disorder and then assessed her with several moderate to marked mental functional limitations stemming therefrom at least in part. See Tr. 244-47. Nor does the Court find any error by the ALJ here was harmless. As noted above, the ALJ assessed plaintiff with the residual functional capacity to perform light exertional work, with additional non-exertional restrictions to "**simple and some more routine, complex tasks, with limited public contact**." Tr. 22 (emphasis in original). As plaintiff points out, though, these restrictions do not encompass all of the moderate mental functional limitations found by Drs. Neims and Trowbridge – such as regarding the ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting and to control physical and motor movements – let alone the marked limitations they found. See Tr. 246, 396, 477.

III.     The ALJ's Assessment of Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to

ORDER - 13

determine whether he or she can do other work. Id.  It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

As just noted, the ALJ assessed plaintiff with the residual functional capacity to perform light exertional work, with additional non-exertional restrictions to simple and also some more routine and complex tasks, and with only limited public contact.  Plaintiff argues this assessment is inaccurate in light of the ALJ's errors in evaluating the medical evidence in the record that Dr. Neims and Dr. Trowbridge provided.  The Court agrees that because of those errors, it is unclear whether the ALJ's RFC assessment accurately encompasses all of plaintiff's mental functional limitations.  The Court further agrees that this assessment cannot be upheld given the ALJ's additional error in his evaluation of the findings and conclusions of Richard Price, M.D., who, in late November 2006, assessed plaintiff with a global assessment of functioning ("GAF") score of 45-50,[5] opining additionally that she continued "to be significantly symptomatic" and that it was

---

[5] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007).  It is "relevant evidence" of the claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007).  "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta, 500 F.3d at 1076 n.1 (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 34); see also Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007) ("[A] GAF score in the forties may be associated with a serious

ORDER - 14

"possible that with appropriate treatment she would be able to perform some type of work within 12 months." Tr. 408. Dr. Price continued in relevant part:

> She has the ability to perform simple and repetitive tasks, and probably some detailed and complex tasks.
>
> She may be able to accept instructions from supervisors and interact with coworkers and the public. She indicated that because of her past experience she tries to avoid contact with others whenever possible.
>
> This would probably be the biggest deterrent to her finding consistent employment. If these feelings could be brought under control then she probably would be able to perform work activities consistently and maintain regular attendance in the work place.

Tr. 409. While the ALJ stated the residual functional capacity limitations he assessed plaintiff with were consistent with those of Dr. Price (see Tr. 24), clearly, as with those of Dr. Neims and Dr. Trowbridge, not all of Dr. Price's findings and limitations are encompassed within the ALJ's RFC assessment.

The Court disagrees, though, with plaintiff's assertion that the ALJ erred in ignoring the moderate to marked mental functional limitations contained in the early March 2004 evaluation report completed by Terilee Wingate, Ph.D., as that report was issued well prior to the relevant time period in this case as discussed above. See Tr. 266-71. As such, the Court finds the ALJ's omission in this instance does not form a proper basis upon which to reverse his assessment of plaintiff's residual functional capacity.

IV.   The ALJ's Step Five Determination

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. See Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir.

---

impairment in occupational functioning."); England, 490 F.3d at 1023 n.8 (8th Cir. 2007) (GAF score of 50 reflects serious limitations in individual's general ability to perform basic tasks of daily life).

ORDER - 15

1999); 20 C.F.R. § 416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids").  See Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).  But the Grids may be used if they "completely and accurately represent a claimant's limitations." Tackett, 180 F.3d at 1101 (emphasis in the original).  That is, he or she "must be able to perform the *full range* of jobs in a given category." Id. (emphasis in the original).

If the claimant "has significant non-exertional impairments," however, an ALJ's reliance on the Grids is not appropriate. Ostenbrock, 240 F.3d at 1162; Tackett, 180 F.3d at 1102 (non-exertional impairment, if sufficiently severe, may limit claimant's functional capacity in ways not contemplated by Grids).  In this case, the ALJ found that none of plaintiff's mental functional limitations significantly restricted the range of work in ways not contemplated by the Grids, and cited to Hoopai v. Astrue, 499 F.3d 1071, 1076-77 (9th Cir. 2007) (finding ALJ's conclusion that claimant's mild to moderate depression and limitations stemming therefrom were not sufficiently severe so as to prohibit ALJ's reliance on Grids). See Tr. 25-27.  As argued by plaintiff, though, both Dr. Neims and Dr. Trowbridge noted marked limitations in her social functioning, and the ALJ failed to properly evaluate those medical sources' opinions.  Thus, it cannot be said the ALJ's step five determination here is supported by substantial evidence.  Because the ALJ did not err in finding plaintiff's other alleged impairments to be not severe, however, those impairments do not provide a basis for overturning that determination.

V.   Remand for Further Administrative Proceedings Is Appropriate

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional

ORDER - 16

investigation or explanation." <u>Benecke v. Barnhart</u>, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." <u>Id.</u>

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." <u>Smolen</u>, 80 F.3d at 1292; <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

<u>Smolen</u>, 80 F.3d 1273 at 1292; <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain in regard to the severity of plaintiff's personality disorder, her RFC assessment and her ability to perform other work existing in significant numbers in the national economy, it is proper to remand this matter for further administrative proceedings.

CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ improperly determined plaintiff to be not disabled. Accordingly, the ALJ's decision hereby is REVERSED and REMANDED for further administrative proceedings for payment of benefits.

DATED this 10th day of December, 2010.

Karen L. Strombom
United States Magistrate Judge

ORDER - 17